30 C.C.P.A. (Patents)

## APPLEBY v. BECKMAN.

### Patent Appeal No. 4647.

Court of Customs and Patent Appeals.

Dec. 1, 1942.

having a drill bit therein, said drill stem having a passageway therethrough into the drill bit and having a lateral discharge opening in a wall thereof,. a sleeve valve slidably mounted in the drill stem in position to close said lateral opening, resilient means acting on said valve in position to close the same, said valve having a central passageway therein, means for closing said valve passageway for opening the sleeve valve by pressure thereabove, and means for removing said passageway closing means by fluid pressure therebelow."

The involved invention is described by the board in its decision as follows: "The device comprises a tubular housing or casing to be secured in the drill string directly above the drill bit. The casing is provided with apertures or ports in its sidewall. A sleeve is slidably secured within the casing to be moved from a position closing the ports to a position opening them. A spring normally urges the sleeve to port closing position. In this position normal drilling operations may be carried on with the usual reverse flow of the drilling fluid. When washing action is desired a ball or plug is inserted in the drill string and the direction of flow of the drilling fluid is reversed. The pressure of the fluid forces the ball or plug into seating engagement with the sleeve and causes it to move to port opening position. The seating of the ball in the sleeve also cuts off the flow of drilling fluid through the bit and causes it to flow laterally from the ports in the tool wall. The fluid thus is directed against the walls of the well and washes down the debris and loose material. When the washing action is completed the direction of flow of the drilling fluid is restored to normal and the ball or plug is forced upwardly in the drill string thus relieving the pressure on the sleeve which returns to its normal port closing position. The tool thus enables a washing action without the necessity of removing the drill string to change tools."

The only controverted issues before us are questions of fact. Each of the parties claims to be the sole and original inventor, and each claims derivation of the invention from him by his opponent.

Both parties took voluminous testimony.

Appellant, Appleby, testified that he was by occupation an oil well driller with eighteen years experience, and as an independent contractor in August 1936, he finished drilling a wildcat well at Winona, Texas;

J. Preston Swecker, of Washington, D. C., for appellant.

Jack A. Schley, of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of the invention defined in the nine counts in issue to appellee, Fred G. Beckman.

The interference is between appellant's application No. 254,095, filed February 1, 1939, and the application of appellee, No. 291,087, filed August 19, 1939, which is a continuation in part of a former application, No. 233,754, disclosing the same invention, filed October 7, 1938.

During the motion period, appellee moved to shift the burden of proof based on his earlier filed application, which motion was granted by the primary examiner.

Therefore appellee became the senior party, and the burden was upon appellant to establish priority of invention by a preponderance of the evidence.

Count 4 is illustrative of the counts in issue and reads as follows: "4. In a well tool, the combination of a tubular drill stem

that upon completion of this project he watched a rig drilling-in a well using reverse circulation, and a day or two later he visited the Muskogee Iron Works at Muskogee, Oklahoma, for the purpose of returning a derrick which he had rented from that concern; that while there he met appellee, Beckman, who was employed by the Muskogee Company as consulting engineer; that at that meeting Beckman gave him a piece of literature describing the methods that he was using in drilling-in wells and cleaning-out wells in East Texas; that this method was known as "reverse circulation", and consisted of " * * a means of returning cuttings from the bottom of the hole, and cavings from the bottom of the hole, by pumping oil or fluid down the casing, around the outside of the rotating drill pipe, and returning the cuttings to the surface through the drill pipe"; that he became interested and about August 15, 1936, drove out and watched a rig installed by Beckman, which employed this method; that Beckman was present while the rig was working, and he, Appleby, talked with him there and with Beckman's driller, one V. E. Fisher; that Fisher told him of some difficulties which were encountered in operating the reverse circulation method; that within twelve or eighteen hours after leaving the rig that day, he conceived the involved invention, and he later went back to the Beckman rig and described it to Fisher; that he drew a rough sketch of the invention on the back of an envelope and showed it to Fisher. This sketch was not produced, but at the hearing Appleby drew a sketch which he testified was similar, except as to proportions, to the sketch that he showed to Fisher. This sketch was introduced in evidence as Appleby's Exhibit 1.

Appleby further testified that about two weeks after his conversation with Fisher he went to work for Beckman and was continuously employed by him as a superintendent of operations until about the 15th of December, 1938, when he was discharged; that in December 1936, he discussed with one Wagner, a superintendent of the Stanolind Oil and Gas Company, the general operation of the tool which he claims to have invented. His testimony upon this point is as follows: "A. I merely discussed with Mr. Wagner, the general operation of the tool, that there were to be ports in the side of the drill collar that were to be opened, as the lower port or lower opening was closed, and that the fluid would be directed out directly against the wall of the well, instead of straight down, as would normally be the case without this tool."

Appleby further testified that in the early part of 1937 he discussed the invention with one Ray Fielder, a production foreman of the Skelly Oil Company. With respect to this discussion he testified: "Q. What disclosure of this idea did you make to Mr. Fielder? A. Practically the same disclosure that I made to Mr. Wagner. I told him that I had in mind such a tool— a tool that would do the things that this tool does or is intended to do, and asked his opinion as to what he thought the value of it would be, in the kind of work that we were doing."

Appleby testified that in the early part of 1937 he disclosed the invention to Beckman, and suggested to him that he permit him, Appleby, to make such a tool and try it; that Beckman declined upon the ground that it would increase the cost of doing the clean-out work and that he was primarily interested in reducing the cost; that thereafter in the first three or four months of 1937 he disclosed the invention to one George Meither, who was the proprietor of "Meither's Machine Shop," and that he submitted to him a rough sketch of the invention and asked him to make an estimate of the price or cost of making the device; that Meither stated that it would cost between $125 and $150; that the device was not made at that time; that early in March 1938, he again discussed the invention with Beckman. His testimony relative to this discussion reads as follows:

"A. * * * He was in the hotel here at the time. It was one night that we were kind of visiting with him in his room. I made a rough sketch of it, very similar to the one that we have introduced as Exhibit No. 1. At that time Mr. Beckman told me—remarked that "we may have to sooner or later come to something of that nature, but at the present time, we seem to be getting along very well without it, and I had rather not do anything that would cause us to stay longer on the job than we are staying, as the principal value of our clean-out work, lies in our ability to do it cheaper than cable tools can do it.'

"Q. Did you describe to Mr. Beckman, in March of 1938, how this proposed tool would operate? A. Yes, I made a rough sketch of it, and we didn't discuss it for any great length of time, just sufficiently, I

think, for him—that I felt that he understood what I had in mind.

"Q. Will you explain how much of a disclosure you made to him, aside from the sketch? A. I merely discussed the wells that had caved in on us, and the ones that we had had some trouble with, and remarked that we should have some way of washing those wells, to make the debris cave off of the wall, and mentioned the fact that if we should make this tool, we could direct a stream of oil—that was the fluid we were using—direct a stream of oil against the sides of the wells and wash those walls off, and have the lower port closed.

"Q. How was the drill pipe to be closed? A. I intended to close it, by using a plug and this movable sleeve.

"Q. Did you tell Mr. Beckman that? A. I don't recall that I did, but it was necessary to show him the means that I had of opening it—show him what I had in mind and how the tool would work.

"Q. What was Mr. Beckman's reaction at the time, in March of 1938? A. Well, he didn't feel that the tool was necessary. We were doing quite a bit of work at the time, and he felt that the tool would increase the cost of doing the work; that it would keep us on the jobs longer; and most of our customers at that time, in fact, were complaining about our cost to them. We were charging much more than most of that type of equipment charges per day, for our work, though our total cost, in the end, was somewhat less than that of other equipment. I feel that Mr. Beckman expressed himself that he was of the opinion, that by using this tool, we would have some tool on the job which would run our time up on each job considerably more than it was, and make the cost probably more than the cost of other methods."

With respect to other disclosures, appellant testified as follows:

"Q. From 1936 to 1938, did you disclose this idea to anybody else, other than those that you have mentioned? A. Oh, practically all of the men that were working for me, either knew through me or through some of the other men who were working with me.

"Mr. Schley: We object to that answer, and move to strike it, as hearsay.

"A. I did discuss it with several of the men, that I remember were working with me at times. Jack Thomas, J. L. Nix, Ot-tis Byrum, and various others, that I don't remember."

With reference to the first construction of the device embodying the invention, Appleby testified as follows:

"Q. While you were still with Beckman, Inc., was a wash collar of this character ever built, so far as you know? A. Yes. There was one built, and several others later. The first one we received sometime in the early part of September, about the first of September.

"Q. Of what year? A. Of 1938.

"Q. Do you know what led to the building of that one, in September, 1938? A. Well, I have always felt that it was my discussions of it. Mr. Beckman came to me in the summer of 1938, one day in the shop, and asked me if I thought a wash tool or drill collar that could be made to wash a well, would be practical, and if we had any need for it. I replied that I did think it would be practical, and I did feel a need for it, and that I had, on several occasions prior to that, mentioned it to him and asked him for one. He told me then that he didn't remember that I had ever mentioned it, and that Frank Denker had just mentioned it to him a few minutes before, in the office, and that it sounded like a mighty good idea to him. I told him then that I had been thinking of it for several years; that I thought it was a good idea, and that I would like to have one; and he replied, when he returned to Muskogee, he would make one and send it to me, and I should try it. And shortly after he returned to Muskogee, we received the wash tool.

"Q. Where was that conversation with Mr. Beckman held? A. In Beckman's Shop, belonging to Beckman, Inc., in Odessa."

Appleby further testified that shortly after receiving the first tool Beckman sent him two other tools embodying the invention, and after some minor modifications made at the Meither Machine Shop, they were successfully operated.

Appleby further testified that two or three months after his employment by Beckman ceased he entered business for himself and engaged in the business of cleaning-out and drilling-in oil wells; that he had the Meither Machine Shop make for him a device embodying the involved invention according to a drawing made by him, and that thereafter this device was successfully operated by him. This drawing was introduced in evidence by Appleby.

With respect to appellant's application for a patent, he testified as follows:

"Q. When did you take steps to apply for a patent on this tool? A. About a week before I left Beckman, Inc., I made a drawing, preparatory to sending it to the Patent Office, for an Application for Patent.

\* \* \* \* \* \* \*

"Q. Did you ever discuss with Mr. Beckman, the question of applying for a patent on it? A. No, I didn't. Mr. Beckman told me, however, right shortly after he brought the first tool down, that he had a patent on it. I didn't discuss it with him to any length, but he said he had a patent on it. And at that time, it seemed that he had obtained a patent on it because the next time I saw him was about a month later. I didn't know how long it took to get a patent, but I took it for granted that he had obtained a patent on the tool, or had bought one, or had one already issued, on a similar tool."

With respect to whether or not Beckman ever disclosed the invention to him, Appleby testified as follows:

"Q. Mr. Appleby, did you ever make any demands on Beckman, Inc., or Mr. Beckman, on behalf of this wash tool invention? A. No, I didn't.

"Q. Why not? A. Well, I felt that everybody in the organization knew at the time that it was mine; it was spoken of as mine, as the tool that I designed. When I first went to work for Mr. Beckman, I was promised an interest in the organization, and that had been discussed several times, between Mr. Beckman and myself, and I felt more or less like I owned an interest in the organization, or ought to, about that time.

"Q. Did you ever receive any interest in the organization? A. No, I didn't.

"Q. Did Mr. Beckman ever disclose to you, a wash tool, as his invention? A. No, I don't know that he ever disclosed one, and claimed it as his invention.

"Q. Did he disclose any at all to you? A. No, he did not."

Upon cross-examination Appleby testified, in part, as follows:

"Q. Did you and Mr. Beckman have any disagreement during the latter part of your employment, as an employee of the Beckman Company?

"Mr. Swecker: I object to this also, as outside of the direct examination.

"Mr. Schley: Any circumstance relating to his employment by the Beckman Company, is believed to be proper examination.

"A. Yes. We had some discussion and disagreement.

"Mr. Schley: Q. Did you make any claim to Mr. Beckman, at this time, that the tool which they had built and you had used, was your invention? A. I don't recall that I did, at that time.

"Q. Insofar as Mr. Beckman understood, when you left the employ, according to anything that you told him at that time, you made no claim to the invention? A. I didn't say anything to him about it at that time, that I recall. I don't recall that I even gave it any thought at that particular time. In fact, I am pretty sure that I didn't.

"Q. Did you leave the employ of your own accord or were you requested to resign?

"Mr. Swecker: I object for the same reason expressed above.

"A. I was requested."

With respect to corroboration of Appleby's testimony relative to the invention, Fisher testified that appellant disclosed the invention to him in August 1936, Fisher at that time being employed by Beckman; that he left Beckman's employ in October 1936, and from that time until November 1939, he had not been employed in that territory or had any experience with reverse circulation; that in November 1939, the first time he had been in Appleby's shop, he recognized the tool embodying the invention and made the remark that "the old man had went ahead and built it." At the time his testimony in chief was taken, October 1940, Fisher testified that he was in the employ of appellant, but when his rebuttal testimony was taken in January 1941, he testified that he was no longer in appellant's employ.

Another witness on behalf of Appleby was one J. L. Nix who, at the time his testimony was taken, was an employee of Appleby.

Although Appleby did not testify to any specific disclosure of the invention to this witness, he, Nix, testified in detail to a disclosure made by Appleby to him in February 1937, stating that Appleby drew "pictures" of the invention on a sketch pad in his room in the hotel.

The only reference made to this witness by Appleby in his testimony was that he

discussed the invention with him and others.

Another witness for Appleby was one Ray Fielder, formerly an employee of the Skelly Oil Company, who testified to a disclosure to him by Appleby in the latter part of January 1937. With respect to the nature of the disclosure he testified as follows:

"Q. Do you know what is now called a wash tool or a wash collar? A. Yes, I think I do.

"Q. What do you understand it to be? A. It is to be a tool that you can change the flow of the fluid and make it directly against the side of the well.

"Q. When did you first hear of such a tool? A. Between the 20th and the last of January, 1937.

"Q. Where did you hear of it? A. At Penwell.

"Q. Who told you about it? A. Mr. Appleby.

"Q. What did he tell you about it at that time? A. Well, he told me that he was working on a tool—understand formerly we had been washing through the bit and we didn't seem to have much luck with it, and he told me that he was working on a tool that he could direct the flow out through the sides instead of the bottom.

"Q. Did he tell you what the construction would be? A. Yes. Probably not in full detail, but I had an idea what he was talking about.

"Q. Will you tell us what he told you at that time? A. As I understand it, it was a tool that he had a sliding sleeve in it and this sleeve had a hole on each side, opposite, and you could drop a ball or plug in there and seat it, and your pump pressure would go out through the sides, and seal it off from the bottom.

"Q. Did he tell you how he would get that plug out again? A. Well, you pump it down through the tubing, and as you change your connection to pump back through the tubing, the flow of the fluid would lift it back through the tubing by the velocity of the flow inside your tubing."

George Meither, hereinbefore referred to, testified on behalf of Appleby, stating that in the early part of 1937 Appleby discussed with him the making of a "wash tool" or "wash collar"; that Appleby while describing the invention made a rough sketch of the device. This sketch was not produced, but the witness made a sketch during the taking of his testimony which he stated illustrated what Appleby described and illustrated to him. This sketch was introduced in evidence as Appleby's Exhibit 7. It clearly does not fully correspond to any of the counts before us.

He further testified as follows:

"Q. Was any provision made for returning the plug, in his disclosure to you in 1937? A. I don't think we talked about that.

"Q. As that was disclosed to you in 1937, could you pump the fluid down through the tubing, into the bit? A. Down through the bit?

"Q. And through the bit? A. Yeah.

"Q. How would that go through, if you had a plug in there? A. Well, we talked about putting a regular sand cap valve or something or other in there, into this plug; you see, this plug had a hole in it. I don't remember about that first one there; the first time we talked about it, *we didn't get very far along on it*. (Italics ours)

"Q. For what purpose did he disclose that to you, in the Spring of 1937? A. Well, he said it was a good tool to use, and he wanted to try to figure out something to work a little different from what they were, or it was something that was new, and he wanted to use it for the purpose of cleaning out a well.

"Q. Did you understand at that time, whether or not that was Mr. Appleby's idea? A. Yeah, the impression I got from him, it was, yeah.

"Q. Did he ask you how much it would cost to build it? A. Yes. I think we discussed it, the next day or two, when we talked about it some more.

"Q. Do you remember what estimate you gave him? A. Well, I told him at the time, I didn't know exactly, but it would run around $150 or $200 to build it."

Upon cross-examination the witness testified that when appellant first talked with him about the device details were not discussed "other than just mentioned the body and the sleeve."

One H. C. Thomas was another witness on behalf of Appleby. He testified that he was an employee of Appleby and had been employed by Beckman from August 20, 1937, until the 23rd day of January, 1939; that in the fall of 1937 there was difficulty about cave-ins in wells and water was poured in the wells which was allowed to

stand overnight; that Appleby told him that he was working upon a tool that would stop the necessity for using water; that Appleby made no sketch of the device. The witness did not testify that Appleby disclosed the device other than in a very general way, but did disclose its mode of operation.

Another witness on behalf of Appleby was one Ottis Byrum, who testified that he was employed by Beckman as a driller; that the first time he ever heard of the involved device was from Appleby. Upon this point he testified as follows:

"Q. What did he say about it? A. Well, he said that when we got this wash collar, that it would give us more work, do a better job on the wells and give us more work.

"Q. Was that before you had received one? A. I don't even remember.

"Q. Do you know what well that was? A. No, I don't.

"Q. Were you using a wash collar at that time, on that well? A. I would say I don't know whether we were or not. I don't think we were. I was roughnecking at that time, and I wasn't very much interested in it.

"Q. Do you recall when you next heard of a wash collar, after that? A. No, I don't. The next time I ever paid any attention to a wash tool, was after I was advanced from roughneck to a driller and then I went to taking more interest in the thing and everything; and then, of course, I ran the wash tool, and I learned all about it.

"Q. When were you advanced to a driller? A. Well, it was some time along in the Fall of the year—I don't know what month—in 1938.

"Q. Before you were advanced to a driller, do you recall Mr. Appleby describing this tool to you? A. On that first time that I ever heard anything said about a wash tool, Mr. Appleby described the wash tool to the crew of us boys that were out there that day, in fact, he drew a picture of it with a stick on the ground, and told us how it would work.

"Q. How much of it did he describe? A. The best I remember, he just drew a picture of the outfit, and had two holes in the side of it, and he told us how the fluid would come out those holes, and wash the walls of the well.

"Q. Did he tell you anything about how the fluid was to be controlled? A. Well, he might have, but I wasn't interested enough at that time, to pay any attention to that.

"Q. Was that quite a little time before you were advanced to a driller. A. Well, it couldn't have been too long. I'll say it couldn't have been over three or four or five months, or something like that, at the most.

"Q. Did you know who was the originator of this wash tool? A. No, I don't.

"Q. Do you know Mr. Fred Beckman? A. Yes.

"Q. Did you ever hear Mr. Beckman describe to you, or to any other of the men, a wash tool, before you used one? A. No sir.

"Q. Do you know, Mr. Byrum, whether or not the men who worked for Beckman, Inc., regarded this as Mr. Appleby's or Mr. Beckman's, idea?

\*     \*     \*     \*     \*     \*     \*

"A. No.

\*     \*     \*     \*     \*     \*     \*

"Q. Did you ever hear any of the men speak of it as Mr. Appleby's idea?

\*     \*     \*     \*     \*     \*     \*

"A. Well, I have heard arguments on that—not arguments either. But certainly, I have heard the boys around on the streets, working for Beckman, and Appleby, talk about that, talk about who the wash tool originator was, or originator is; and of course I have heard some say that it was Mr. Appleby's, and some say that it was Mr. Beckman's."

Coming now to the testimony on behalf of Beckman, it was testified by him that he is a graduate of the University of Missouri, and in 1913 received a degree in electrical engineering; that he is president of Beckman, Inc., which is engaged in contracting for the drilling-in and cleaning-out and reconditioning of oil wells through "reverse circulation," (for which his company owned patents) together with a number of tools developed by him; that in September 1933, while connected with the Muskogee Iron Works, he conceived the involved invention, and between that time and the first of the year, 1934, he disclosed it to M. N. Coles, employed by the Muskogee Iron Works as a draughtsman; that he also disclosed it during said time to C. B. Grant, a salesman for said company, and to J. R. Wright and W. J. Steiert, employees of said company; that later on he discussed it with Earl Anthis, an insurance man, W. R. Banker, an attorney, Fred Suhre, a pat-

tern maker and E. F. Edwards, an employee of Beckman's but formerly a production superintendent for R. H. Dearing and Sons; that he also disclosed it to a number of other individuals, some of whom were not called as witnesses.

Beckman testified in detail as to his disclosure to Cole, stating that he drew some sketches to explain what he was talking about. These sketches were not produced. Beckman further testified that in the late summer of 1934 he explained the invention in detail to Banker and Anthis at a restaurant, drawing sketches of the same upon the tablecloth; that in November 1935, he described the invention to one E. E. Kirkpatrick, who was then the superintendent of the Devonian Oil Company; that some months after the early spring of 1934 he discussed the invention with D. M. Wiley, treasurer of the Muskogee Iron Works, and that in the fall of 1935, he disclosed it to Henry Burns and Alvin Burns; that in June 1936 and again about the middle of August 1936, he disclosed the invention to E. F. Edwards, explaining to him in detail its construction; that in the fall of 1933 and in 1934, he disclosed it to W. J. Steiert, an employee of Beckman's company; that in the fall of 1934 or early spring of 1935, he disclosed the invention to Frank Denker, then employed by the Shell Petroleum Company. It appears that Denker is a brother-in-law of Beckman and at the time the testimony was taken was employed by Beckman's company.

Of the witnesses called on behalf of Beckman and relied upon for corroboration of Beckman's testimony respecting conception of the invention, Edwards, Denker and Steiert were, at the time the testimony was taken, employees of Beckman's company, and Coles was employed by the Muskogee Iron Works.

M. N. Coles, one of the witnesses relied upon for corroboration of Beckman's testimony, testified, in part, as follows:

"Q. When he (Beckman) told you about this wash tool did he explain how he was going to make it? A. He and I had several discussions as to just what would be the best thing. That was one thing Mr. Beckman and I used to do. We had some pretty hot arguments over whether this way or some other way would be the best.

"Q. Did you have any of those arguments in 1935? A. Yes, sir. I would say we probably had some of them in 1934.

"Q. Well, now, did you have any in 1936? A. Yes.

"Q. Now, did he tell you the details in any of his arguments as to how he was going to make the wash tool, describe any of the parts to you? A. Yes, he did.

"Q. Do you recall in a general way how he proposed to construct the tool? A. Well, you might call it a body and would have to have the proper thickness of the wall, it would have to have a different wall section than the ordinary pipe, and be a piston or sleeve or something in there that could be forced down by pump pressure uncovering ports in the side of it and these ports would be small enough so the velocity of the fluid working out would wash the side of the hole.

"Q. Did he tell you anything about whether it was to be hollow? A. Well, the piston or sleeve would necessarily have to be hollow in order to allow the fluid to come back up through the tubing when the circulation was reversed to what was called conventional,—it would therefore flood the removable plug at some point, so as to force this piston or sleeve down to uncover those ports and at the same time would be removable, to allow the reverse circulation.

"Q. Did that plug go down the whole sleeve? A. Yes, it would have to go down to the holes in the center as I say, so you could not pump directly out of the bottom but it would have to go out of the sides of the tool.

\* \* \* \* \* \* \*

"Q. Is this drawing, Exhibit C, a fair representation of the working system—contemplated working system? A. Yes, although it does not go into all of the details, but it was a drawing. This primarily I would say was a drawing to get in concrete form what conditions your tools, or the well, might be in.

"Q. I see, and I believe I understand that the substance of your discussion with Mr. Beckman prior to making this drawing in July, 1938, was of other systems to circulate down through the bottom of the well and force out the cuttings and wash the bottom of the well? A. Yes, sir.

\* \* \* \* \* \* \*

"Q. You were asked on cross-examination concerning the sketch—concerning Exhibit C. I understood from your answer that you only discussed the reverse circulation system of pumping fluid down through

the bit, is that correct? A. That wasn't my intention to answer it that way. It was customary when Mr. Beckman and myself would make up some kind of a drawing or sketch, which would in a general way represent the idea that we had in mind to then use that as a basis in our discussions and arguments, whether it would work or whether it would not work, and while that represented in a general way the reverse circulating project it was also to be used in discussing some means for getting a washing action on the walls of the hole there."

It is conceded that the drawing referred to does not disclose the involved invention.

The witness, Denker, testified very vaguely as to a disclosure made by Beckman to him in May 1935. His only positive testimony upon the subject reads as follows:

"Q. I show you a photostat of drawing in the application of Fred G. Beckman, No. 233754, and ask you if you can understand that kind of drawings? A. Yes, I can, I believe.

"Q. What does it show? A. Well, it shows the wash tool.

"Q. Does it show the system that he gave you in May of 1935? A. Yes, I think it does, very much so.

"Q. And does it conform or does it not conform to the mental picture that you got from the disclosure that he made to you? A. Well, I would say it does.

"Mr. Swecker: We object to the leading manner of the examination and showing the witness the drawing before he was able to describe the subject matter."

The witness, Steiert, also testified as to a conversation with Beckman in May or June 1936, regarding the invention, but his testimony concerning what Beckman said to him falls short of disclosing the invention in issue.

The witness, Kirkpatrick, testified that he was an oil producer, and that previous to July 31, 1940, he had for a period of twenty-one and a half years been production superintendent for the Devonian Oil Company; that in November 1935, Beckman cleaned-out a well for his company. He further testified as follows:

"Q. Did you have any conversation with Mr. Beckman at that time about his tools? A. Well, that well was more or less of an experiment in that type of cleaning-out at that time and we put burlap out away from the well to catch the sand in and we found a lot of paraffin in the material and cavings which came out of the hole and Mr. Beckman came up to see how it was operating and we got along pretty well until we found this paraffin and he suggested he could use a spray on the side of the walls up higher by using a ball in his tubing that would reserve the circulation and either pump it down or pump it out the shot hole of the well and clean it out either way and we were back behind the engine house as I remember it, when we were discussing it and we discussed the fact that it would be a good thing if it was developed and it could be used to wash down the sand and the paraffin at the same time under pressure.

"Q. Did he tell you how he would arrange that inside or outside to make it work? A. He said he was going to use a ball with a spring in it.

"Q. A spring? A. Yes, sir, and I could see from a practical standpoint the advantages of it and I made the remark at the time, I said, 'Fred, I think you have something there and I would be willing to put some money in it.' It looked good to me for the reason that in fifteen minutes you could either wash the walls of the shot hole down and then turn around and put your fluid down below without drawing your bit and you could wash down the walls and keep doing that until you had cleaned out the shot hole.

"Q. Did he tell you what he was going to use that spring for? A. The spring would trip a sleeve in there and let the sleeve either down or up, I forgot which it would be, so it would open the holes on the side of the tool and would plug the lower opening and the fluid would operate out on the walls of the well.

"Q. What did the ball do? A. It would stop the fluid from going on down where the bit was.

"Q. Did the ball have anything to do with the spray going out on the sides? A. The ball would be to hold the spring so after you release the spring or sleeve in there it makes the openings open is the way I understood it. I didn't go into all of the details with him.

"Q. Did he tell you how he would get the ball out? A. Yes, sir, he could reverse the circulation and turn around and pump it out in five minutes; that's the way I understood it and from a practical standpoint it would save pulling your tubing and running it again and on a job that would

ordinarily take you several days to do you could do it his way in five or six or ten hours."

The witness, Edwards, testified that about the middle of August 1936, Beckman fully disclosed the invention to him; that he described at length the details of such disclosures and Edwards stated that in his presence Beckman drew a sketch of the device in a time book kept by Beckman. Said page containing a sketch was marked "Beckman's Exhibit D" and was introduced in evidence by Beckman. Thereafter Appleby introduced in evidence the remaining pages of the book which was marked Appleby's Exhibit 11.

Alvin G. Burns, engaged in the oil business, testified that in July 1936, he visited a Beckman rig employing reverse circulation. He further testified as follows:

"Q. Now, did Mr. Beckman ever explain to you, the purposes to you, of the tools that he was going to use? A. Oh, yes. That was what made us so interested in it, was the fact that he could wash out the gelatinous precipitate and then after it washed down from the walls of the well it was carried out by reverse circulation.

"Q. Now, did he ever explain to you, discuss with you the tool which he called a wash tool? A. Yes, he did.

"Q. Do you remember when he discussed that tool with you? A. At the well down there in East Texas, and during our discussion before we went down there.

"Q. Do you recall from your memory any of the construction of that tool? A. Oh, yes, I think I could describe it fairly well.

"Q. Will you do so? A. Well, he told me that he had a tool to go on the bottom of the tubing or drill pipe which when a ball was dropped in the bottom it opened up vents or holes on the side that permitted the fluid to be forced out there at a very high velocity—I don't know what he said other than very high rate—and wash down the precipitate and the debris off of the side of the formation. When that was completed they reversed the circulation and the ball was removed and those vents closed and the precipitate carried out by the reverse circulation.

"Q. Do you recall anything about how those ports were to be closed and opened? A. Well, I would not say in detail. It was just the compressing action of the ball and pressure upon it—the valves, the holes in the valves, or whatever you call it.

"Q. I hand you a photostat of drawings from Beckman's Application No. 232754 and will ask you if the drawing therein has any resemblance to what Mr. Beckman disclosed to you that you have testified about? A. Yes, that is the tool that did the job.

"Q. Does that conform to what he stated to you? A. Exactly. I have never seen a drawing of the tool. I have seen photographs, but this too, that is the thing that will do the job.

"Q. Does that conform to the construction that he had on this occasion? A. Exactly."

With respect to the other corroborating witnesses for Beckman, W. R. Banker was a lawyer and Earl G. Anthis was an insurance agent. These witnesses were not familiar with the oil business, and under all the circumstances we gravely doubt that either at the time of the alleged disclosure to them fully understood it.

Much of the controversy involves the question of originality. Appleby contends that he disclosed the invention to Beckman in the early part of 1937 and again in March 1938; that Beckman has not unequivocally denied these disclosures, and that all of the surrounding circumstances show that he, Appleby, was the original inventor.

With respect to Beckman's denials of having derived the information from Appleby, we quote from his testimony as follows:

"Q. Did you ever build or have built any tools that were manufactured and used by Beckman, Incorporated, upon any suggestion or disclosure of information given to you by Mr. P. W. Appleby? A. I did not. He told me at one time they were in need of a tubing plug and suggested the purchase of an Otis tool but there was never any suggestion that I know of, made to me, as to the construction or the operation of the wash tool.

*  *  *  *  *  *  *

"Q. Had you had any conversations with Mr. Appleby or had he given you any information previous to July or August or September, let's say previous to July of 1938, which would indicate to you that he knew anything about the operation of your wash tool? A. He did not.

"Q. Did you consider it necessary to instruct him in the use of this wash tool? A. I did.

*  *  *  *  *  *  *

"Q. Did you have any help or suggestions from Mr. P. W. Appleby in building or making your lay-out drawings for the construction of these wash tools? A. I did not.

"Q. Did he write you any letters, giving you any instructions or making any suggestions? A. I don't know of any if he did.

"Q. Did he make any suggestions to you over the telephone about how the tools should be built? A. He did not.

"Q. Did you rely in any respect upon any information that you had received from him or anyone else in building the wash tools about which you have testified? A. I did not. I will say further that I had worked out the general structure and had conceived the idea and had conceived the construction and the use of the tool before I ever met Mr. Appleby.

"Q. Did he ever request you to build a wash tool for him? A. He did not.

"Q. Or for use in your business? A. No, he did not.

"Q. Did he ever make any claim to you while in your employ that he was the inventor of a wash tool? A. He has never made any claim to me while in my employ.

"Q. Nor in the employ of Beckman, Incorporated? A. Nor Beckman, Incorporated, nor at any other time with the exception of the filing of the interference in this case.

"Q. That it was his invention? A. That it was his invention. The first knowledge I had of any claim he made was when the interference was declared on the patent application I had made on the tool; that was my first knowledge of it.

       *    *    *    *    *    *    *

"Q. When Mr. Appleby was discharged, did he make any claim or any statement to you about being the inventor, or having had anything to do with the development of this wash tool? A. No, sir, he made no claim whatever.

"Q. Did he make any at any time while you were operating that tool or did he ever speak about it to you as being his tool? A. He never spoke to me about it being his tool and never made any claim to me at any time or at any place up to this date that it was his tool. The only claim he ever made was in the Patent Office through this interference proceeding."

Furthermore, Appleby testified that when in the summer of 1938 Beckman discussed the involved device with him, he, Appleby, told Beckman that he did need such a tool and stated to him that he had on several occasions prior to that mentioned it to him and asked him for one, but that Beckman replied that he didn't remember that he had ever mentioned it.

■ In view of the foregoing, we think that it should be held that Beckman clearly denied derivation of the invention from Appleby. Of course, if Beckman was the first to conceive the invention he was entitled to an award of priority. In order for Appleby to succeed, he must have established by a preponderance of the evidence that he was the first to conceive the invention and was diligent in reducing it to practice, or that Beckman derived the invention from him.

The Board of Interference Examiners held that Appleby had not established conception of the invention at any time prior to the filing date of the Beckman application on October 7, 1938. In its decision the Board stated:

"It is believed that if Appleby's testimony is interpreted most favorably it establishes nothing more than that he had some general idea concerning the desirability of washing the well walls. The evidence, it is believed however, fails to establish that he had any detailed or specific idea of the construction of a device to accomplish this end. This is not sufficient to prove conception. Mergenthaler v. Scudder, 11 App.D.C. 264, 81 O.G. 1417, 1897 C.D. 724.

"Appleby contends that he is the original inventor and that he disclosed to Beckman. This is unequivocally denied by Beckman (Beckman record, pages 83, 111, 115 and 117). Since Appleby has failed to establish prior conception it does not appear to be necessary to consider the question of derivation in any detail since obviously in order to disclose he must have been in possession of knowledge of the invention.

"Appleby made no demands upon Beckman while in his employ (Appleby record, page 25), and at first chose to discuss his idea whatever it was, with others rather than Beckman. The reason advanced was that Beckman had no experience yet Appleby admitted that Beckman was a competent engineer and had no difficulty understanding his alleged later disclosure of the invention.

"It is believed that Appleby has failed to sustain the burden placed upon him and

that the record establishes that Beckman was the first and sole inventor."

It will be observed from the foregoing quotation that the board found it unnecessary to consider Beckman's actual date of conception.

After carefully reviewing all of the evidence in the record, we are compelled to say that in many respects we find it unsatisfactory on both sides, and each of the parties can and does criticize the sufficiency of the testimony introduced in behalf of his opponent.

We find that Beckman was a very loquacious witness who seemed to find it very difficult to directly and concisely answer questions propounded to him, making it difficult to sift out from his testimony matters which are directly pertinent to the issues involved. It seems strange that if he really conceived the invention in 1933, as he claims, that he should have waited until 1938 to make complete drawings and construct a device embodying the invention. True, his explanation that in 1933 and for sometime thereafter his reverse circulation method for which he or his company owned patents had not been established commercially, and that he did not consider the invention here involved as of any special value except in connection with his reverse circulation, accounts for his inactivity during the early portion of the period between 1933 and the summer of 1938. But commercial success of the reverse circulation had been established early in 1937, and it would seem that if he was then in possession of the invention he would have proceeded to reduce it to practice, the need for it being apparent.

On the other hand, it seems very unlikely that Appleby should have conceived the invention at the time stated by him, within twelve or eighteen hours after observing for a short time the operation of a rig employing the reverse circulation method. That he might have realized the desirability of a tool which accomplishes the result secured by the present invention seems very plausible, after Fisher's statements to him about some defects in the reverse circulation method, but that he should have conceived every essential detail of the invention within that time seems improbable. It seems also very improbable that Fisher, his chief corroborating witness, should from recollection alone, four years after the event, have remembered every essential detail of the rather complicated device. The same observation is applicable to appellant's other witnesses, who testified from recollection alone as to all the details of the invention.

Of course, evidence of invention may be established by oral testimony alone. However, as stated by us in the case of Frank Jardine and Ferdinand Jehle v. Elmer C. Long, 58 F.2d 836, 837, 19 C.C.P.A., Patents, 1243:

" * * * However, this doctrine, in the final analysis, means only that when oral testimony alone is produced to prove the facts necessary to establish priority, such testimony will be most carefully scrutinized, in the light of human experience and under such knowledge of human nature as the courts possess, and that all circumstances surrounding the transaction will be most carefully looked to in bringing the mind to a conclusion as to what the truth really is."

The same observations which we have made concerning the witnesses for Appleby are applicable for the most part to the corroborating witnesses in behalf of Beckman.

As Appleby's chief corroborating witness was Fisher, an employee of Appleby, so Edwards, the chief corroborating witness for Beckman, was an employee of Beckman's company, and his oral testimony is subject to the same observations which we have made respecting the testimony of Fisher with this exception: Both Beckman and Edwards testified to a sketch made by Beckman in a time book kept by Beckman. Both testified that this sketch was made in August, 1936. This sketch was introduced in evidence as Exhibit D. It, however, without the oral testimony explaining it, is of little probative value.

It seems, however, to be established that the sketch was made about the time stated, for the time book begins with July 19, 1936 and it ends with September 12, 1936.

Appleby contends that this evidence was deliberately fabricated; that the sketch was not made at the time testified to, and that the testimony relating to it is false.

This is in effect a charge of deliberate perjury against Beckman and Edwards, but we find nothing in the record to substantiate such charge.

After careful consideration of all the evidence in the case, we are of the opinion that the evidence of Beckman and that of the witnesses in his behalf, is, upon the whole, as credible as is the evidence of

Appleby and that of the witnesses in his behalf. So holding we must find that Appleby has not met the burden of proof resting upon him of establishing priority of conception by a preponderance of the evidence.

The effect of this conclusion is that if it should be held from the evidence that Appleby has established conception of the invention about August 15, 1936, or at sometime thereafter but prior to October 7, 1938, the filing date of Beckman's earlier application, it should also be held that Beckman has established conception of the invention not later than August 15, 1936.

In view of this conclusion, it is unnecessary further to discuss the question of originality, for this question could arise only if it should be held that Appleby was the first to conceive the invention.

It follows that upon the record before us we must hold that Beckman was the first to conceive the invention and the first to reduce it to practice. The decision awarding priority of invention to him is affirmed.

Affirmed.